UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

BARTHALOMEW J. McHUGH,       )
                                         )
              Plaintiff,           )
                                         )
      v.                        )   CASE NO. 4:06-cv-164-DFH-WGH
                                         )
INDIANA FAMILY AND SOCIAL     )
SERVICES ADMINISTRATION, *et al.*,   )
                                         )
           Defendants.      )

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Barthalomew McHugh is the biological father of E.M.  He never married E.M.'s mother, Kimbarly Jones, but McHugh established his paternity by court order, paid child support, and had visitation rights with E.M.  On Friday, July 29, 2005, child protection workers received words that Jones' newborn baby by another father had tested positive for methamphetamine, indicating that Jones had been using methamphetamine.  The child protection workers went to Jones' home that evening.  They removed both the infant and E.M. and immediately put them in foster care.  The child protection workers tried but were unable to reach E.M.'s father McHugh that night; he lived in another state roughly 80 miles away. They made contact the following evening and told him that E.M.'s case would have an emergency court hearing on Monday, August 1, 2005.  McHugh appeared for that hearing with counsel.  The court ordered that E.M. be kept in foster care

pending further proceedings.   After additional developments detailed below, McHugh gained custody of E.M. in November 2005.

In this lawsuit, McHugh alleges that several child protection workers and supervisors violated his constitutional rights by placing E.M. in emergency foster care rather than with him, as E.M.'s biological father.   He alleges that they continued their violations by continuing the foster care placement for another three and one half months when there was no evidence or even allegation that he was an unfit father or would be unable to care for E.M.   McHugh also claims that the defendants violated his rights under state law.   He seeks damages and injunctive relief.

The defendants have moved for summary judgment on all claims.   Because McHugh is proceeding without counsel, defendants' motion included notice to McHugh about the nature of summary judgment and his obligation to respond. See S.D. Ind. L.R. 56.1(h); *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir. 1982). McHugh has responded with relevant evidence and with cogent and detailed arguments.   As explained below, however, the undisputed facts show that the defendants acted properly in removing E.M. immediately from a household in which his mother and her boyfriend were using methamphetamine.  There was no opportunity to contact McHugh before that removal, and the defendants made reasonable and successful efforts to contact McHugh immediately afterwards. From that time forward, McHugh was able to participate in all court proceedings

in the case.  For all of defendants' actions, including that immediate removal, the undisputed facts also show that the defendants are entitled to absolute immunity under both federal and state law because they sought and obtained state court approval at every step.  Construing the record in the light reasonably most favorable to McHugh, the court assumes for purposes of the summary judgment motion that the state courts erred by continuing E.M.'s foster care placement beyond August 1, 2005 until November 2005.  The court also assumes that the defendants could have persuaded the court to allow McHugh to take custody of E.M. if they had chosen to do so.  However, because these defendants obtained court approval for their actions, McHugh is not entitled to recover damages from any of these defendants.  The remedy for an erroneous state court decision is an appeal, not a lawsuit for damages against the prevailing party.  The court grants summary judgment for all defendants on all claims.[1]

---

[1]McHugh's amended complaint also asserted parallel claims on behalf of E.M., but the court dismissed those claims by order of May 25, 2007.  In the same order, the court dismissed all claims against Dubois County DCS and Indiana Department of Child Services.  Those state agencies are not "persons" subject to liability under 42 U.S.C. § 1983.  See *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989); *Holmes v. Marion County Office of Family and Children*, 349 F.3d 914, 919 (7th Cir. 2003).

*Summary Judgment Standard*

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The motion should be granted if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 248.  A court's ruling on a motion for summary judgment is akin to that on a motion for a directed verdict.  The question for the court on both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

*Facts for Summary Judgment*

The following account of facts for summary judgment is not necessarily true in an objective sense, but it reflects the record through the lens of the summary judgment standard.  These facts are either undisputed or reflect the evidence in the light reasonably most favorable to plaintiff as the non-moving party.

*The Parties*:  Plaintiff Barthalomew McHugh is the biological father of E.M., and his paternity was established in 2000.  Def. Ex. A.  While McHugh never

married E.M.'s mother Kimbarly Jones, he paid child support, paid E.M.'s medical insurance, and was granted reasonable visitation "at such times as agreed upon by the parties." *Id.* He usually saw E.M. every month or two, and shortly before the events at issue here, he had taken a week's vacation with E.M. in June 2005.

Defendant Amy Tempel has been employed as a Family Case Manager by the Dubois County Department of Child Services ("DCS") since September 2002. Tempel Decl. ¶ 2. The Dubois County office of DCS is a local office of a state agency under the umbrella of the Family and Social Services Administration. As a case manager, Tempel is responsible for investigating allegations of child abuse and neglect and for providing child welfare services to children in need and their families. Defendant Lana Tobin is a Family Case Manager Supervisor with DCS and supervised Tempel. Defendant Susan Lesko has been Director or Acting Director of the DCS office in Dubois County. Lesko was responsible for administering public assistance programs and child welfare programs, preparing a budget for the office, and supervising FCM Supervisors. *Id.* ¶ 5. Defendant Gloria Rahman is an attorney who has contracted to provide legal services to the DCS office in Dubois County, including E.M.'s case.

*DCS Receives Report of Neglect*: On Friday, July 29, 2005, DCS received a medical report stating that a drug test for Kimbarly Jones, who had been in the local hospital recently to give birth to her second child, A.S., had tested positive

for amphetamines and that A.S. had tested positive for methamphetamine. Tempel was assigned to investigate the report.

Tempel contacted the Huntingburg police department to have an officer accompany her to Jones' residence. Two Huntingburg officers went with Tempel to Jones' residence that same day. When they arrived, Tempel introduced herself and explained that DCS had received a report of neglect. The following people were present: Jones; E.M. (who was six years old); newborn A.S.; Mark Small, who was Jones' boyfriend and A.S.'s father; and Jones' parents and sister. McHugh was not present. He lived and worked in Kentucky.

Tempel discussed the allegations in the report with Jones and Small. Tempel asked them whether they had used drugs since A.S.'s birth. Both admitted that they had used as recently as one or two days earlier. Tempel asked Jones and Small to submit to a drug test, and they agreed. Both tests were positive for methamphetamine. Tempel Decl. ¶ 10.

Tempel believed that Jones' and Small's ability to supervise and care properly for A.S. and E.M. was impaired because of their methamphetamine use and that an emergency order for removal of the children from the household was necessary to protect the children. Tempel Decl. ¶ 11. Tempel advised her supervisor Tobin of the situation. Tobin agreed that removal of the children was appropriate. She directed Tempel to contact the juvenile court judge, Circuit

Judge William Weikert, to request an emergency order to remove A.S. and E.M. Tempel Decl. ¶ 13; Tobin Decl. ¶ 5.

Tempel telephoned Judge Weikert and advised him of the situation. She advised Judge Weikert that Jones' parents had requested that the children be placed in their care, but that one of the law enforcement officers had informed her that Jones' parents had a history of drug use. Judge Weikert orally ordered Tempel to remove A.S. and E.M. from their home and to place them in emergency foster care. Tempel Decl. ¶ 14; Hearings Transcript 34 (confirming oral order during later court hearing). Tempel then took both A.S. and E.M. to a foster home licensed through DCS. Tempel contacted DCS attorney Rahman on July 29, 2005, to inform her of the removal. Rahman also contacted the Dubois Circuit Court, which handles juvenile law matters in Dubois County, to request a detention hearing. A detention hearing was set for August 1, 2005. Rahman Decl. ¶¶ 5-6.

*DCS Contact with McHugh after Removal*: Also on July 29, 2005, after the order for removal had been given, Tempel attempted to contact E.M.'s father, McHugh, who lived in Kentucky. Tempel Decl. ¶ 16. Tempel tried to call McHugh several times at a telephone number provided by Jones but was unable to reach him. Tempel left messages informing McHugh of her name, position, and contact information, including a number at the Indiana State Police where he could have her paged. On the night of Saturday July 30, 2005, Tempel received a call from

the Indiana State Police informing her that McHugh was attempting to contact her. Tempel Decl. ¶ 17. She called McHugh that same night. She told him what had happened the previous day, told him that a detention hearing had been scheduled for Monday, August 1, 2005, and asked him to meet her a few minutes before the detention hearing.

*Petition Alleging that E.M. was a CHINS*: Tempel later prepared an Intake Officer's Report of Preliminary Inquiry and Investigation that was filed with the Dubois Circuit Court on August 1, 2005. A copy of the report was given to attorney Rahman. Rahman reviewed the report and agreed with the report's recommendation that a petition be filed to determine whether E.M. and A.S. were children in need of services ("CHINS"). Rahman Decl. ¶ 8.

On August 1, 2005, Rahman filed a Request for Filing of Petition in the Dubois Circuit Court, attaching the report and asking for authorization to file a petition alleging A.S. and E.M. were CHINS. The Dubois Circuit Court granted the request, and Rahman filed a Verified Petition Alleging Children in Need of Services. Rahman Decl. ¶ 10, Ex. 2.

*Detention Hearing*: The detention hearing on the CHINS petition was held on August 1, 2005 before Senior Judge Hugo Songer. Tempel Decl. ¶¶ 20, 22; Hearings Transcript 1-27. Approximately fifteen minutes before the detention hearing, Tempel met with McHugh and discussed the case with him. Tempel

provided McHugh with a copy of the report and gave him an Advisement of Rights. During their meeting, McHugh told Tempel he had a history of marijuana possession, Tempel Decl. ¶ 21, though a limited criminal background check run at Tempel's request that day showed no criminal record.  Pl. Ex. A.

McHugh, Jones, and Small all attended the detention hearing.  Tempel Decl. ¶ 23; Hearings Transcript 2.   McHugh was represented by attorney Joseph Verkamp.  Tempel testified regarding her investigation and the removal of A.S. and E.M. from their home and placement in foster care.  McHugh's attorney cross-examined Tempel at the detention hearing.   McHugh also testified.   Tempel testified that E.M. could not be placed with McHugh without a home study:

> Q    But you . . your . . your position is that you will not agree to [McHugh] having custody without some kind of home study?
> A    Not at this point, no.
> Q    Even though he is the father of the child.
> A    Even though he is the father.  He did admit to me that he has had a past history, I believe he said, of possession.  And just to be on the safe side, we'd rather have the opportunity to review that, and do . . do a thorough background check and home study on him prior to placing the child in a home.
> Q    [McHugh] told you that five or six years ago he had been . . . uh . . . charged with possession of marijuana, is that correct?
> A    He didn't give me an indication of how long ago it had been. He said it had been awhile.

Hearings Transcript 9.  Neither Tempel nor any other witness at the detention hearing testified or provided any admissible evidence that McHugh was an unfit parent.  When Tempel ran a criminal background check on McHugh, the  report came back clear.

McHugh testified that he visited E.M. "at least once every month or two." McHugh explained "he's in school, and I work on the weekends, so I get him when it's feasible for both of us."  Hearings Transcript 15.  When questioned by E.M.'s mother's attorney, McHugh stated he would agree with E.M. being placed with his maternal great-grandparents once a study was done of their home.  Attorney DeMotte asked the court to order a home study and background check of the maternal great-grandparents and to consider placing the children with the maternal great-grandparents once they were eligible.  Tempel recommended that E.M. and A.S. remain in foster care until services could be provided to the parents or until sufficient background studies had been conducted to allow placement of the children in a relative's home.  Tempel Decl. ¶ 26; Hearings Transcript 5.  On August 1, 2005, the day of the hearing, the state court ordered that E.M. and A.S. remain in their foster care placement and that a home study of the maternal great-grandparents be conducted by a private agency.  Hearings Transcript 23-24. The written docket entry for August 1, 2005 also states that the court found that probable cause existed for the emergency oral removal order of July 29, 2005. The next day, August 2, 2005, McHugh contacted Tempel and sought her help in gaining custody of E.M. because he was the boy's father and because he had done nothing wrong.  Pl. Ex. F.

*Subsequent Proceedings*:  The next court proceeding was an initial hearing on the petition alleging E.M. and A.S. were children in need of services, held before Circuit Judge Weikert on August 9, 2005.  McHugh attended the initial

hearing and was again represented by attorney Verkamp.  Hearings Transcript 28.  The parents of A.S. and E.M. each denied the allegations in the petition.  Judge Weikert ordered that A.S. and E.M. remain in foster care pending further hearing and set a fact-finding hearing for November 1, 2005.  Rahman Decl. ¶ 18, Ex. 4; Ex. G, CCS Entry for August 9, 2005.

On August 29, 2005, McHugh filed a Motion to Assign Separate Cause Number for E.M.  Pl. Ex. C.  McHugh expressed his concern that Small would have access to confidential information about E.M. and McHugh because Jones' two children had been assigned to one case with two different fathers.  See Ind. Code § 31-33-18-2 (identifying persons who may have access to information in CHINS cases).  McHugh argued that the only way to ensure confidentiality was to issue separate case numbers.  The court granted his motion, dismissed the original CHINS case involving both E.M. and A.S., Case No. 19C01-0508-JC-0129, and assigned separate cause numbers for each child.  E.M. was assigned Case No. 19C01-0509-JC-0178.   DCS attorney Rahman then filed a request for authorization to file a petition alleging E.M. was a CHINS and for further detention of E.M. in DCS custody.

On September 22, 2005, Tempel again prepared an Intake Officer's Report of Preliminary Inquiry and Investigation.  Pl. Ex. D.  The September 22 report was signed by Tempel, Tobin, and Lesko.  The report restated the events of July 29, 2005, that led to E.M.'s removal from Jones and placement in foster care.  The

only mention of McHugh is a reference to him as E.M.'s father.   In the September 22 report, DCS stated that its goal was to "work to reunify this child with his mother."   The September 22 report recommended:

> The child shall remain in his current foster care placement.  Mother shall cooperate fully with all service providers, the child's physician, and the DCS.   Mother shall participate in individual counseling, homemaker services, AA/NA as recommended by her therapist, submit to random drug screens, and attend parenting classes.  Mother shall keep all appointments with the DCS and service providers and follow any additional recommendations that are made.  Supervised visitation shall take place between the mother and child at this time.  The child shall continue to be closely monitored by his physician.

*Id.* The September 22 report explained:

> The DCS does not feel the mother is able to properly care for her child at this time due to her use of methamphetamine.   Furthermore, an environment in which the drug is being used is not appropriate for children. [E.M.] will be watched closely by his physician.  The DCS feels the child can best be cared for at this time in his current foster care placement.

On September 26, 2005, Judge Songer issued a new order granting the request to file a petition alleging E.M. was a CHINS.  The order further stated that E.M. was to remain in the physical and legal custody of DCS and to remain in foster care.  Rahman Decl. ¶ 21, Ex. 6.  Also on September 26, 2005, Rahman filed a Verified Petition alleging Child in Need of Services in Case No. 19C01-0509-JC-0178.  Rahman Decl. ¶ 22, Ex. 7.  On October 13, 2005, an initial hearing was held in E.M.'s new case, Case No. 19C01-0509-JC- 0178.  At that hearing, the court again ordered that E.M. remain in the physical and legal custody of DCS

and remain in his foster care placement.  Rahman Decl. ¶ 23, Ex. 8.  The undisputed facts show that McHugh was present for all hearings concerning E.M. held in Case No. 19C01-0508-JC-0129 and Case No. 19C01-0509-JC-0178, and that he filed numerous motions and other documents with the court throughout the course of the CHINS cases.  Rahman Decl. ¶ 24; Def. Ex. G.

*Placement and Visitation with McHugh*:  While E.M. was a ward of the State in foster care, McHugh had one hour of supervised visitation with E.M. per week where defendants actually observed McHugh's interaction with E.M. and took notes.  See Tempel Decl. ¶ 28; Pl. Ex. O.  This arrangement was different from the Agreed Custody Order that had been in place regarding Jones and McHugh, for that earlier order made no mention of supervised visitation and allowed for reasonable visitation at such times as the parties agree.  The CHINS orders effectively supplanted that earlier order with respect to visitation, however, since they removed Jones' right to be part of any agreement on visitation.  The CHINS orders did not include any provision for visitation at all, but one hour per week was provided.  The record does not indicate that McHugh challenged that silence in the CHINS court orders.

Defendants have offered evidence that throughout the time Tempel managed E.M.'s case, she asked McHugh to complete a home study.  She believed that a home study was required under the Interstate Compact on the Placement of Children ("ICPC") because McHugh lived out of state.  Tempel Decl. ¶ 29.  DCS

took the position that a home study had to be completed by a Kentucky social services agency pursuant to the requirements of the ICPC before E.M. could be placed in McHugh's home.  Rahman Answer to Pl. Interrog. No. 2.  Defendants have provided no evidence in the record that they asked the court to order a home study.  The record indicates that the ICPC process begins with the completion of particular form, yet no such completed form was provided by defendants.  Defendants also provided no evidence that DCS staff communicated with their Kentucky counterparts as required by the ICPC.

McHugh faxed a letter to DCS on August 2, 2005, stating that he wanted custody of E.M. immediately.  Pl. Ex. F at 1.  He said he would move to Dubois County immediately if his out-of-state residence was the only reason he was being denied custody of E.M.  McHugh had previously lived, worked, and gone to school in Dubois County.[2]

Tempel also asked McHugh to submit to all necessary background checks and participate in services.  Tempel Decl. ¶ 29.  No home study of McHugh was ever ordered by the judge in the CHINS case.  Lesko Answer to Pl. Interrog. No. 17.

---

[2]McHugh has submitted his Exhibit F, consisting of 60 pages of correspondence and emails between him and Tempel and Rahman, along with a few from his family members.  Exhibit F shows that McHugh was consistently demanding that defendants agree to give him custody of E.M. as soon as August 2nd, and even included a threat of legal action against Tempel as early as September 1st.  For purposes of summary judgment, the court assumes from Exhibit F that Tempel, Tobin, Lesko, and Rahman understood that they had no evidence that McHugh was unfit as a parent or had neglected E.M.

*McHugh Gains Custody of E.M.*:  While the CHINS case was still pending, McHugh returned to the original court case that had established his paternity of E.M. and provided for support and visitation, Cause No. 19C01-0001-JP-0012. McHugh filed a motion for a change of custody of E.M. from Jones to McHugh. The court in the paternity action (apparently also Circuit Judge Weikert) granted McHugh custody of E.M. on November 16, 2005.  Rahman Decl. ¶ 25.  Also on November 16, 2005, after McHugh had been granted custody of E.M., DCS attorney Rahman filed a motion to dismiss the CHINS case on behalf of DCS. Rahman Decl. ¶ 26, Ex. 9.  Judge Weikert granted the DCS motion and dismissed the CHINS case on November 16, 2005.  Rahman Decl. ¶ 27, Ex. 10.  The court assumes that McHugh gained custody of E.M. that same day.  Additional facts are noted below as needed, keeping in mind the standard for summary judgment.

*Discussion*

On November 20, 2006, McHugh filed this suit under 42 U.S.C. § 1983.  His amended complaint alleges that defendants violated his rights under the substantive and procedural due process guarantees of the due process clause of the Fourteenth Amendment, the equal protection clause of the Fourteenth Amendment, and the Fourth Amendment.  McHugh also alleges that, by placing E.M. in foster care, defendants interfered with McHugh's right to custody of E.M. in violation of Indiana Code § 35-42-3-4.  He seeks relief under Indiana Code § 34-24-3-1, which authorizes private civil relief for violations of that criminal statute.

McHugh also pleads a claim under Indiana law for intentional infliction of emotional distress.  McHugh seeks both damages and injunctive relief against future wrongdoing against him and other non-custodial fathers whose children are neglected by custodial mothers.

Defendants' motion for summary judgment raises a host of issues, not all of which need to be addressed.  For purposes of summary judgment, the court assumes, as explained below, that McHugh could prove (a) that the state court decisions placing E.M. in foster care were erroneous and violated his constitutional rights, (b) that the court should have placed E.M. in McHugh's custody immediately, or at least sooner than it did, (c) that the defendants persuaded the court to err, and (d) that the defendants could have persuaded the court to act correctly if they had tried to do so.  Even if all that is true, the doctrine of absolute quasi-judicial immunity bars McHugh's federal civil rights claims because all of the defendants' challenged actions were authorized by court orders.  See *Millspaugh v. County Dep't of Public Welfare*, 937 F.2d 1172, 1175-76 (7th Cir. 1991) (affirming judgment for defendants who allegedly wrongfully removed children from parents' custody pursuant to court order).  In such a case, the remedy for an incorrect decision is an appeal, not a damages claim against the government employees in the case.

McHugh's claims under state law fare no better.  State law provides similar absolute immunity for state employees (and state agencies) for their assistance

to the court in CHINS proceedings.  See *H.B. v. State of Indiana–Elkhart Div. of Family & Child Svcs.*, 713 N.E.2d 300, 302-03 (Ind. App. 1999) (affirming summary judgment for defendant based on immunity where children alleged that case workers were negligent in recommending reunification with mother who was still living with boyfriend who molested children).   McHugh also has not come forward with evidence to support a finding of intentional infliction of emotional distress or a violation of Indiana Code § 35-42-3-4.  His request for injunctive relief does not present a case or controversy because there is no evidence that the defendants are likely to subject him again to a similar alleged wrong.

I.      *Merits of the Constitutional Claims*

        A.      *Fourteenth Amendment Claim for Interference with Family Relations*

        At the core of all of McHugh's claims is the assertion that defendants deprived him temporarily of his right to the care, custody, and management of E.M., and did so not because of any wrongdoing on his part but solely because of wrongdoing by E.M.'s mother Kimbarly Jones.  McHugh claims that his rights to substantive due process and family relations were violated.

        The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law . . . ."  The Supreme Court has long recognized that the liberty interest in family relations (also referred to as family integrity) is one of the oldest and

deepest privacy interests in our Nation and is worthy of substantial constitutional protection.  *E.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (rights relating to the parent-child relationship are "the oldest of the fundamental liberty interests recognized"); *Santosky v. Kramer*, 455 U.S. 745, 760 (1982) ("until the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of the natural relationship"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."); *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 845 (1977) (distinguishing the interests of natural families from those of foster families;"the liberty interest in family privacy has its source . . . in intrinsic human rights, as they have been understood in this Nation's history and tradition") (internal quotations omitted); *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000) (right of parents to bear and raise children is the most fundamental of all rights of all civilization).  This substantive due process protection of family relationships under the Fourteenth Amendment provides the most readily applicable doctrine for evaluating whether the defendants' actions in placing E.M. in foster care and keeping him there for three and one half months violated McHugh's constitutional rights as a father.  *Id.*

The right to family integrity protected by the Fourteenth Amendment is not absolute. It is "limited by the compelling government interest in the protection of children particularly where the children need to be protected from their own parents." *Brokaw*, 235 F.3d at 1019, quoting *Croft v. Westmoreland County Children and Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997). As a result, courts must balance the fundamental right to family relations and government's interest in protecting children from abuse. *Brokaw*, 235 F.3d at 1019. In balancing the government's interest against the parent's interest, courts must keep in mind that the state has no interest in protecting a child from his own parents unless it has some definite and articulable evidence that gives rise to an inference that the child has been or is in imminent danger of abuse. *Id.*

On this record, McHugh has no viable basis for challenging the emergency removal of E.M. on Friday, July 29, 2005 and his immediate placement in foster care until the court hearing on Monday, August 1, 2005. Tempel confronted powerful evidence of neglect of both E.M. and A.S. Both boys' mother and her boyfriend in the home admitted ongoing methamphetamine use and tested positive for its use. Tempel faced an emergency, and she used reasonable efforts to attempt to contact McHugh that same night. She had no evidence of neglect by McHugh, but he was simply absent and not available on short notice. She also sought and obtained an emergency removal order from the court that was later confirmed. The emergency removal did not violate McHugh's rights.

On this record, however, there are at least genuine issues of material fact concerning whether the defendants violated McHugh's right to family relations with E.M. from the time McHugh appeared on the scene on August 1, 2005, until he gained custody on November 16, 2005.  There simply is no evidence of any neglect by McHugh.[3]

At least for purposes of summary judgment, defendants acknowledge that McHugh had a protected liberty interest in his family relationship with E.M., Def. Br. 20, but defendants argue that the interest was very limited because he had no right to custody but only to rather infrequent visitation.  See, *e.g.*, *Terry v. Richardson*, 346 F.3d 781, 784-86 (7th Cir. 2003) (assuming that non-custodial parent had constitutionally protected interest in visitation rights); see also *Brittain v. Hansen*, 451 F.3d 982, 992 (9th Cir. 2006) (holding that non-custodial parent with court-ordered visitation rights had liberty interest in companionship, care, custody, and management of child); *Swipies v. Kofka*, 419 F.3d 709, 714 (8th

---

[3]In their reply brief, defendants asserted at several points that McHugh failed to support with admissible evidence his assertions that defendants never presented any evidence that he was an unfit father or had neglected E.M, and other assertions as to the absence of evidence supporting the defendants' position. See Def. Reply Br. ¶¶ 43, 53, 59, 63 64.  These objections are overruled.  A party need not support with admissible evidence an assertion that "there is no evidence of X."  A party who moves for summary judgment may point to the absence of evidence on a point the opposing party must prove; that's the key holding of *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Similarly, a non-moving party may point to the absence of evidence supporting a moving party's actions, as in this case or, for example, an absence of evidence supporting an employer's decision to fire an employee for some asserted failings on the job.  Pointing to the absence simply invites the opposing party to show that there is in fact such evidence, if there is.  Defendants here have offered no evidence that McHugh was an unfit father or had neglected E.M.

Cir. 2005) (holding that non-custodial parent had protected liberty interest in care, custody, and management of child). Defendants also point out that Jones, as the unmarried mother of the child, had sole custody of him. See Ind. Code § 31-14-13-2 (biological mother of child born out of wedlock has sole legal custody, unless statute or court order provides otherwise, such as an order in a CHINS proceeding).

The undisputed facts show that McHugh did not have a regular schedule of visitation. He and Jones had agreed to agree on the matter. As far as this record indicates, they had done so amicably and to the satisfaction of both. McHugh saw E.M. for a few days every month or two, and he had recently taken E.M. for a week's vacation with members of the extended McHugh family. From defendants' perspective, McHugh did not miss out on much as a result of E.M.'s placement in foster care for three and one-half months. He missed no more than perhaps a couple of short visits with E.M.

At least at the summary judgment stage, the court believes this argument overlooks the critical fact that DCS had removed E.M. from his mother's custody. It is one thing for a father to agree that a child should be in the custody of the mother, as McHugh had when E.M. was an infant. The situation is entirely different when the state removes the child and puts him in foster care. Once it was clear that Jones would not have custody for at least some significant time because of her drug use and the CHINS case, McHugh could reasonably view

himself as the best available person to care for E.M.  He was the boy's father and had a strong and close relationship with him.  See *Lehr v. Robertson*, 463 U.S. 248, 261 (1983) ("When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the Due Process Clause.  At that point it may be said that he 'act[s] as a father toward his children.'"), quoting *Caban v. Mohammed*, 441 U.S. 380, 392 & 389 n.7 (1979).

The cases cited above suggesting that a non-custodial parent's liberty interest in visitation is protected but minimal do not address this problem, where the non-custodial parent reasonably believes there is a need for him to step in and fill a void left when the other parent is not available to care for the child.  In such instances, the law naturally looks to the other parent, at least as long as the other parent has a significant relationship with the child, as McHugh did.  For example, if Jones had died, McHugh would have been first in line to assume custody of E.M.  See, *e.g.*, *In re Riley*, 597 N.E.2d 995, 998 (Ind. App. 1992) (affirming denial of grandmother's petition for custody; when custodial parent dies after a divorce, non-custodial parent is presumed to have right to custody absent evidence of unfitness or abandonment); *In re McGuire*, 487 N.E.2d 457, 460-61 (Ind. App. 1985) (reversing award of custody to grandparents); see generally, *Stanley v. Illinois*, 405 U.S. 645 (1972) (unmarried father had federal constitutional right to hearing on custody of children after mother died and before state could be

removed from his custody).  Although McHugh and Jones were not married, his paternity was established legally.  He had provided financial support and had visitation rights that he had exercised to establish a bond with son.  This case therefore is not limited to McHugh's visitation rights but extends to his strong and constitutionally protected interest in having custody of E.M. during a period when the boy's mother could not care for him.

Viewing the evidence in the light most favorable to McHugh, a reasonable jury could find that defendants Tempel, Tobin, Lesko, and Rahman acted without justification to block McHugh from obtaining custody of his son, for there simply was no evidence of neglect or abuse by him.  The defendants did not flatly refuse to allow McHugh to have custody of E.M., but they insisted that he subject himself to the sorts of screening that a more distant relative or a foster parent would need to submit to, such as a home study and psychiatric evaluation, and criminal background check.  In the absence of evidence that a parent is not a fit parent, he ordinarily does not have to prove to the state that he is a suitable person to have custody of his own child.  As Justice O'Connor wrote in *Troxel v. Granville*, "there is a presumption that fit parents act in the best interests of their children." 530 U.S. at 68.

After the defendants located McHugh and he appeared on the scene in Dubois County, the defendants arguably had no compelling interest in denying him custody of E.M.  Each parent has his or her individual rights as a parent.  In

*Troxel v. Granville*, the Supreme Court explained that courts must begin with a presumption that a parent is fit and acts in the best interests of his child.  "[S]o long as *a parent* adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of *that parent* to make the best decisions concerning the rearing of *that parent's* children."  530 U.S. at 68-69 (emphasis added).  Under Indiana law, a child must be proven to be a child in need of services relative to both parents, even if one of those parents is a non-custodial parent. *C.S. v. Marion County Office of Family and Children*, 863 N.E.2d 413, 418 (Ind. App. 2007) (reversing finding of CHINS as to unmarried father where mother and child had tested positive for illegal drugs at time of child's birth but there was no evidence that father was unfit).

The evidence that Tempel relied on to remove E.M. from Jones' home, and that Tempel, Tobin, Lesko, and Rahman relied on in making the August 1 and September 22 reports was compelling, but it had no bearing on McHugh's individual rights as a father.  Defendants have never had any evidence that E.M. would have been in danger of abuse or neglect in McHugh's custody.[4]

---

[4]There was one reference to a prior conviction for possession of marijuana. See Hearing Transcript 9.  Viewed in the light most favorable to McHugh, that possession had occurred five or six years in the past, possibly even prior to E.M.'s birth, and it does not amount to definite and articulable evidence that E.M. was likely to be abused or neglected if he were in McHugh's custody in 2005.

Viewing the evidence through a different lens, the court can imagine that a reasonable jury might find that McHugh's rights were not violated, or at least were not violated as soon as August 1, 2005, the date of the first court hearing. On an emergency basis, DCS and the court faced a case with two children being raised in a home where both adults were using methamphetamine. They had information that even the children's maternal grandparents had a record of drug use that raised concerns about whether placement with them would be suitable. The Indiana statute governing temporary placement of a child taken into DCS custody directs that the court "shall consider placing the child with a suitable and willing blood or adoptive relative caretaker, including a grandparent, an aunt, an uncle, or an adult sibling, before considering any other out-of-home placement." Ind. Code § 31-34-4-2(a). Before placing a child with a relative, the court "may order" DCS to complete a home study and to provide the court with a placement recommendation. Ind. Code § 31-34-4-2(b).

Whether this statute applies by its terms to a non-custodial, unmarried father in McHugh's situation is not perfectly obvious, and whether the statute may be applied constitutionally to a non-custodial father in McHugh's situation is at least an interesting question. Consider, for example, whether the statute's application or constitutionality would depend on a court's evaluation of the strength of the bond between father and child. Compare *Lehr v. Robertson*, 463 U.S. at 261 (affirming adoption of child where unmarried father had not taken steps to ensure he would receive advance notice of adoption; father had never

established relationship with child), with *Caban v. Mohammed*, 441 U.S. 380 (1979) (holding that state law violated equal protection clause by granting mother a veto right over adoption of children but denying father a veto right where he had admitted paternity and participated in raising children).   Compare also *In re C.S.*, 863 N.E.2d at 419 (reversing finding that child was CHINS with respect to unmarried father who had tried to establish paternity in days before newborn infant was removed from mother's custody), with *In re S.M.*, 840 N.E.2d 865, 869 (Ind. App. 2006) (affirming termination of parental rights of unmarried father who had failed to take any steps to establish paternity or to demonstrate fitness as a parent).   And assuming that the strength of that father-child bond matters, the most relevant questions for present purposes are how should the court make that determination, and how quickly?

From this perspective, and in view of uncertainty about how the law might apply to McHugh, one can easily understand why case manager Tempel wanted to "be on the safe side" by trying to obtain a home study for McHugh and why the state court might have agreed with that cautious approach, at least for a while. And persons familiar with DCS caseloads and resources might also understand why it might have taken more time than McHugh could tolerate before DCS and the court came to the conclusion that McHugh should take custody of E.M.  This court therefore should not be understood as holding that McHugh's rights were in fact violated or that the state courts' decisions were erroneous.

For purposes of defendants' motion for summary judgment, however, the court must view the evidence through the lens most favorable to McHugh. Through that lens, the evidence would support a finding that defendants violated McHugh's federal constitutional right to family relations with E.M. after August 1st. Defendants are not entitled to summary judgment on the merits of this claim, though they have a valid immunity defense, discussed below.

B.   *Procedural Due Process*

McHugh also asserts a procedural due process claim. To prevail on this claim, McHugh must first demonstrate that he was deprived of a liberty or property interest, and second that he was not afforded due process. *Brokaw*, 235 F.3d at 1020. The record shows that McHugh was temporarily deprived of a liberty interest, the right to family relations with E.M. Consequently, the court must determine what process was due to McHugh. In the context of child protection, the Seventh Circuit has explained that a "government official will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances." *Brokaw*, 235 F.3d at 1020. Removal of the child first, with a hearing afterward is justified only in circumstances where the child's safety is threatened. *Lossman v. Perkarske*, 707 F.2d 288, 291 (7th Cir. 1983); see also *Donald v. Polk County*, 836 F.2d 376, 380 (7th Cir. 1988) ("In an emergency situation, the government

may take away property or liberty, so long as postdeprivation notice and a hearing are provided.").

On July 29, 2005, defendants faced a situation in which E.M.'s safety was threatened by Jones' and Small's use of methamphetamine. Defendants removed E.M. from Jones' and Small's home, and McHugh was given almost immediate notice and a very prompt post-deprivation hearing. There was no practical opportunity for a pre-deprivation hearing. The prompt post-deprivation hearing means that McHugh was not deprived of procedural due process as a result of the removal of E.M. from Jones' home.

After that initial removal, the state court proceedings provided McHugh with all the process that might have been due. McHugh was given notice of all key steps, and he was given ample opportunity to be heard. He appeared both in person and with counsel at multiple hearings on E.M.'s status. The courts heard his testimony and arguments. For purposes of summary judgment, the court again assumes that the state courts erred by not giving custody of E.M. to McHugh almost immediately, but an erroneous state court decision is not a violation of the federal due process clause. *Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 711 (7th Cir. 2004); *Pro-Eco, Inc. v. Board of Commissioners of Jay County*, 57 F.3d 505, 514 (7th Cir. 1995); *Tuffendsam v. Dearborn County Bd. of Health*, 2004 WL 256442, *4 (S.D. Ind. Jan. 28, 2004).

Although McHugh received notice and multiple opportunities to be heard in the state courts, the Seventh Circuit's decision in *Brokaw v. Mercer County* indicates that he might still have a viable due process claim because "no matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." 235 F.3d at 1020. In *Brokaw*, the court reversed dismissal of a complaint alleging that the child had been removed from his home without an investigation, a pre-deprivation hearing, or exigent circumstances. *Id.* at 1021. The *Brokaw* court also held that allegations that the defendants had deliberately provided false information at the post-deprivation hearing stated a claim for a procedural due process violation. *Id.*[5]

Based on *Brokaw*, the court examines McHugh's allegations that defendants provided false information to the court. First, he argues that defendants failed to represent to the court that he had no criminal history. Second, he argues that at least by the time of the September 22nd report, defendants knew that he was no longer residing in Kentucky, that he had moved to Indiana, and that the Interstate Compact on Placement of Children no longer applied. Even viewing the evidence in the light most favorable to McHugh, neither argument avoids summary judgment on the merits of the procedural due process claim.

---

[5]Unlike the defendants in this case, the defendants in *Brokaw* did not raise a defense of absolute judicial immunity, see 235 F.3d at 1014 n.10, and they had not obtained a court order for emergency removal of the child. *Id.* at 1007.

First, the undisputed evidence shows that no defendant told the court that McHugh had a criminal record when he did not.  The undisputed facts show that McHugh himself told Tempel on August 1st that he had a criminal record for possession of marijuana.  The record contains no other details about that conviction, but it is perfectly understandable that defendants wanted to learn more about it.  The failure to tell the court that McHugh had no criminal record may have been a failure to argue McHugh's case for him, but it could not have been a misrepresentation of any fact.  McHugh and his counsel were given ample opportunity to apprise the court of his status before the court made any decision about continuing foster care for E.M.

The second allegation – that McHugh was living in Kentucky when he was not – also was not a misrepresentation of a material fact by any defendant.  The record here does not clearly establish when McHugh moved to Indiana from Kentucky.  McHugh has not come forward with evidence that would allow a jury to find that any defendant deliberately misled the court on this point.  Also, the undisputed evidence shows that McHugh and his attorney had ample opportunity to clarify or correct any misstatement that might have been made concerning McHugh's residence before the court ruled.  Because McHugh has failed to come forward with evidence that would allow a reasonable jury to find that any defendant deliberately lied to the court, defendants are entitled to summary judgment on the merits of the procedural due process claim.

C.    *McHugh's Other Constitutional Claims*

McHugh also argues that defendants violated the Fourteenth Amendment equal protection clause and the Fourth Amendment prohibition on unreasonable searches and seizures.  Neither of these constitutional provisions fits this case as well as the substantive due process protection for family relations.  McHugh has not identified any statutory classification that discriminated against him.  To the extent he argues that defendants misapplied state law against him, he has not offered evidence that defendants were motivated by any suspect classification such as race or gender.   And an erroneous application of state law is not transformed into a constitutional violation by merely invoking the equal protection clause.

There also was no search or seizure of McHugh.  See *Donald v. Polk County*, 836 F.2d 376, 384 (7th Cir. 1988) (parents and siblings of child taken into protective custody were not themselves subjected to search or seizure).  To the extent that McHugh might have had a right to complain about the original removal of E.M. from Jones' home, the undisputed evidence shows that the removal was both justified on emergency grounds and authorized by Judge Weikert's oral order to Tempel.  There was no violation of McHugh's rights in the original removal.  See *Brokaw*, 235 F.3d at 1010 (removal of child from home and family is reasonable under Fourth Amendment if done pursuant to court order or supported by probable cause or exigent circumstances, meaning that state officials have reason

to believe that life or limb is in immediate jeopardy).  McHugh has raised an interesting question as to whether a home study would amount to a search subject to the Fourth Amendment, but the court need not answer that question because McHugh never agreed to or experienced a home study.  To the extent McHugh was denied access to or custody of E.M. for a time, that claim is best addressed in terms of family relations protected by substantive due process.[6]

II.   *Federal Immunity Doctrine*

McHugh has presented facts sufficient to support a finding that his substantive due process right to family relations with his son E.M. were violated after August 1, 2005 because there was no evidence that he posed any danger of abuse or neglect.  But McHugh's effort to obtain damages from the individual defendants under federal law encounters one insuperable obstacle.  At every stage of the case, the state courts ordered the defendants to take the actions that caused the alleged constitutional violation.  Even the emergency removal on July 29, 2005 was ordered (orally) by the state court.  And from the first court hearing on August 1st until the final decision to give McHugh custody on

─────────────

[6]McHugh also named James W. Payne, the director of Indiana Department of Child Services, as a defendant.  Payne has testified that he had no personal involvement in this case.  McHugh has offered evidence that he faxed letters to Payne's attention in November 2005, but he has offered no evidence that Payne actually received any of these messages or otherwise had any personal involvement in E.M.'s case.  Liability under section 1983 requires proof of personal responsibility for a violation; mere supervisory responsibility is not sufficient. *E.g.*, *Schultz v. Baumgart*, 738 F.2d 231, 238-39 (7th Cir. 1984).  Payne is also entitled to summary judgment based on lack of personal responsibility.

November 16th, state court judges ordered E.M. to stay in foster care under state supervision.

Because the harm to McHugh was caused by the court orders, the defendants are entitled to absolute quasi-judicial immunity for their actions in obtaining those court orders.  In a similar family relations suit against Indiana child protective workers, the Seventh Circuit explained the difference between this absolute judicial immunity and the qualified immunity that applies in most civil rights cases:

> Prosecutors and witnesses are absolutely immune from liability in damages on account of their acts in court.  We held in *Buckley v. Fitzsimmons,* 919 F.2d 1230, 1239-45 (7th Cir.1990), that the dividing line between absolute and qualified immunity is whether the injury depends on the judicial decision.  If there would be no loss but for the judge's acts, then the prosecutor or witness who induces the judge to act has absolute immunity.  We drew this conclusion from *Imbler v. Pachtman,* 424 U.S. 409 (1976), which discusses prosecutorial immunity, and *Briscoe v. LaHue,* 460 U.S. 325 (1983), which discusses witness immunity.  After oral argument in this case the Supreme Court decided *Burns v. Reed,* 500 U.S. 478 (1991), which reinforces *Buckley*'s approach.  *Burns* held a lawyer absolutely immune from liability for acts while representing the state during a probable cause hearing but only qualifiedly immune for giving legal advice to the police; the principal distinction was that the advice (and the officers' acts in reliance on that advice) could cause injury without the mediation of a judge.
>
> *        *        *
>
> Protection does not vanish when the proceeding is *ex parte*; *Burns* observes that absolute immunity covers testimony and prosecutorial acts before a grand jury, which conducts ex parte inquiries.  111 S. Ct. at 1941 & n. 6.  We therefore agree with decisions holding that social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision to the court.

*Millspaugh v. County Dep't of Public Welfare of Wabash County*, 937 F.2d 1172, 1176 (7th Cir. 1991) (affirming summary judgment for defendants). *Millspaugh* explains that only qualified immunity applies to certain other actions of child welfare workers that are not subject to direct court supervision:

> Tucker's application for the order initiating the case, and her journey to Indianapolis to obtain custody of the children, call for different analysis. The application for the initial order was much like a police officer's affidavit seeking a search warrant, which we know from *Malley v. Briggs*, 475 U.S. 335 (1986), falls outside the scope of absolute immunity. Sallying forth to collect the children is no different from seizing evidence on the authority of a warrant, which again is covered by qualified immunity only.

*Id*. The *Millspaugh* court explained: "If there would be no loss but for the judge's acts, then the prosecutor or witness who induces the judge to act has absolute immunity." 937 F.2d at 1176.

The undisputed facts here show that every loss that McHugh sustained resulted from an act of a state court judge. At each step of the way, including the initial emergency removal of E.M., the state court judges ordered that E.M. remain in foster care. McHugh has argued that those judicial decisions were wrong. For purposes of defendants' motion for summary judgment, this court assumes that they were. But they were nonetheless decisions of the state courts that kept McHugh and E.M. apart. Under *Millspaugh*, defendants are entitled to absolute judicial immunity on all of McHugh's constitutional claims.

McHugh argues that the defendants should not be entitled to immunity because, he posits, if they had recommended to the court that he take custody of E.M., the court probably would have accepted that recommendation. Perhaps, but the argument does not matter. The doctrine of absolute immunity does not depend on how persuasive the defendants were or whether they might have persuaded the court to reach a different conclusion.

The absolute immunity also applies even if the plaintiff claims that the defendants lied to the court. In *Millspaugh*, the court relied in part on the Supreme Court's decision in *Briscoe v. LaHue*, 460 U.S. 325, 336-41 (1983), which held that section 1983 did not affect absolute immunity for police officers for court testimony even if a plaintiff alleges that police officers deliberately lied to court. McHugh also attempts to distinguish the immunity cases on the ground that in none of them was there a total absence of evidence of neglect or abuse. He cites *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), for the proposition that the state may not attempt to break up a natural family, over the objections of parents and their children, without some showing of unfitness and for the sole reason that doing so would be in the children's best interest.

McHugh is arguing in essence that absolute immunity should not apply in a really bad case, one where the state court's decision was especially wrong or resulted from deliberate perjury. The court is not persuaded. First, there is no evidence of perjury here. Second, and more fundamental, the doctrine of absolute

immunity in cases where the injuries were caused by court decisions is not so limited.  Such a limitation would effectively erode the doctrine, which serves important interests of finality.   See *Briscoe v. LaHue*, 460 U.S. at 335 ("controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree.  The loser in one forum will frequently seek another . . . . Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation."), quoting *Butz v. Economou*, 438 U.S. 478, 512 (1978).  Accordingly, the doctrine of absolute immunity bars all of McHugh's claims for damages under federal law.[7]

III.    *Indiana Law Claims*

    As noted above, all claims against the Dubois County DCS and Indiana DCS have been dismissed in a previous Entry from the Court.  And, Indiana law specifically grants government employees immunity from suit for actions they take within the scope of their employment.  Ind. Code § 34-13-3-5(b).  The actions taken by Tempel, Tobin, and Lesko were actions performed in the course of their employment.  Rahman's status is less clear, since it appears she was not actually

---

[7]This absolute immunity extends to attorney Rahman, for the immunity depends on the role she played rather than the details of her contractual relationship with DCS.  See *Ernst v. Child and Youth Services of Chester County*, 108 F.3d 486, 504 (3d Cir. 1997) (reversing judgment against attorney who filed motion seeking stay of court order granting visitation rights to grandmother); see generally *Auriemma v. Montgomery*, 860 F.2d 273, 277 (7th Cir. 1988) (recognizing that absolute immunity protects the functions that government officials perform, not the officials themselves).

a state employee.  Regardless of the state law doctrines addressing when an individual might be responsible for a tort and when the state or an agency might be responsible, the decisive obstacle for McHugh's state law claims is that state law also provides absolute immunity for state employees (and state agencies) for their assistance to the court in CHINS proceedings.  *H.B. v. State of Indiana–Elkhart Div. of Family & Child Svcs.*, 713 N.E.2d 300, 302-03 (Ind. App. 1999) (affirming summary judgment for defendant based on immunity where children alleged that case workers were negligent in recommending reunification with mother who was still living with boyfriend who molested children).  The same reasoning would extend to attorney Rahman, whether she was an employee or independent contractor.  See *Steele v. McDonald's Corp.*, 686 N.E.2d 137, 142 (Ind. App. 1997) (affirming dismissal of claim against witness:  "The law provides absolute immunity for all participants, including witnesses, for the performance of their duties in a judicial proceeding.").  Defendants therefore are entitled to summary judgment on McHugh's claim for intentional infliction of emotional distress.

McHugh also brings a claim for interference with custody under Indiana Code § 35-42-3-4, seeking civil relief under Indiana Code § 34-24-3-1.  Subsection (a) of that statute pertains only to removal and concealment of a child out of state.[8]  There is no evidence that E.M. was removed out of state.  Subsection (b)

---

[8]The statute provides in subsections (a) and (b) as follows:

(continued...)

cannot reasonably be read as applying to child protection workers who remove a child from a home pursuant to a court order for the child's protection. Additionally, McHugh does not suggest that E.M.'s location was concealed. McHugh has not provided evidence sufficient to sustain a claim for interference with custody.  Defendants are entitled to summary judgment on this claim.


IV.   *Injunctive Relief*

McHugh seeks injunctive relief in addition to damages.  The immunity doctrines that block his claims for damages do not apply to his request for injunctive relief, but McHugh has had custody of E.M. since November 16, 2005.

---

[8](...continued)
(a) A person who, with the intent to deprive another person of child custody rights, knowingly or intentionally:
(1) removes another person who is less than eighteen (18) years of age to a place outside Indiana when the removal violates a child custody order of a court; or
(2) violates a child custody order of a court by failing to return a person who is less than eighteen (18) years of age to Indiana;
commits interference with custody, a Class D felony.  However, the offense is a Class C felony if the other person is less than fourteen (14) years of age and is not the person's child, and a Class B felony if the offense is committed while armed with a deadly weapon or results in serious bodily injury to another person.

(b) A person who with the intent to deprive another person of custody or parenting time rights:
(1) knowingly or intentionally takes;
(2) knowingly or intentionally detains; or
(3) knowingly or intentionally conceals;
a person who is less than eighteen (18) years of age commits interference with custody, a Class C misdemeanor.  However, the offense is a Class B misdemeanor if the taking, concealment, or detention is in violation of a court order.

To obtain injunctive relief for the future, McHugh would need to show a real or immediate threat that defendants will take similar action against him in the foreseeable future.  See *Los Angeles v. Lyons*, 461 U.S. 95, 111  (1983).  There is no evidence here indicating that McHugh might be subjected to the same arguable violation of his constitutional rights again.   His claim for injunctive relief is dismissed for lack of an actual case or controversy.

*Conclusion*

For the reasons outlined above, defendants' motion for summary judgment is GRANTED as to all claims.  All claims for damages are dismissed with prejudice and all claims for injunctive relief are dismissed as moot.  Final judgment shall be entered in favor of defendants.

So ordered.

Date: May 27, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Juliana B. Pierce
INDIANA STATE ATTORNEY GENERAL
Julie.Pierce@atg.in.gov

BARTHALOMEW J. MCHUGH
136 North Patterson
Clarksville, IN 47129